UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

v. 24 CR 116(NSR)

SENTENCE

MAXIM MARCHENKO,

Defendant.

------------------------------------x

United States Courthouse
White Plains, N.Y.
July 17, 2024

Before: THE HONORABLE NELSON S. ROMÁN, District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
SHIVA LOGARAJAH
JENNIFER ONG
Assistant United States Attorneys

KERRY LAWRENCE
BENJAMIN ALLEE
Attorneys for Defendant

THE DEPUTY CLERK: This is a proceeding in the criminal matter United States of America v. Maxim Marchenko, 24 CR 116.

Counsel, please note your appearances for the record, beginning with the government.

MS. ONG: Good morning, your Honor. Jennifer Ong and Shiva Logarajah for the government, and with us here at counsel table is FBI Special Agent Jason Wick.

THE COURT: Good morning to the three of you.

MR. LOGARAJAH: Good morning, your Honor.

MR. LAWRENCE: Good morning, your Honor. Kerry Lawrence and Benjamin Allee, counsel for Mr. Marchenko, who is seated between us.

THE COURT: Good morning. And good morning to your client.

All right. This is a proceeding in the matter of United States v. Maxim Marchenko, docket number 24 CR 116, and it's intended to be the sentencing of the defendant.

I note for the record that the defendant is present in the courtroom and seated next to counsel.

I have reviewed the presentence investigation report dated June 5th, 2024 which was prepared in connection with today's sentencing of the defendant. I have also reviewed the government's submission dated July 12th, 2024 as well as the defendant's submission dated July 5th, 2024.

Has the government reviewed the presentence report?

MS. ONG: Yes, your Honor.

THE COURT: And does the government have any objections to the presentence report?

MS. ONG: No, your Honor.

THE COURT: Mr. Lawrence, have you had an opportunity to review the presentence report?

MR. LAWRENCE: Yes, your Honor.

THE COURT: And have you had an opportunity to discuss it with your client?

MR. LAWRENCE: Yes, your Honor.

THE COURT: Do you have any objections to the report that you wish to raise?

MR. LAWRENCE: Your Honor, we had made some factual objections in the presentence report, most of which were rejected by the Probation Department. We are not going to request any kind of hearing on any of the factual objections we made. We made the objections. Probation rejected them. And we do agree that the guideline calculation, as set forth by the presentence report and as stipulated between the parties, is the appropriate guideline range.

THE COURT: All right.

Mr. Marchenko, have you had an opportunity to read and review the presentence report?

THE DEFENDANT: Yes.

THE COURT: And did you have an opportunity to discuss the presentence report with your attorneys?

THE DEFENDANT: Yes.

THE COURT: The Information, which was filed on February 29, 2024, charges in Count One:

From at least in or about May of 2022 up to and including in or about September 2023, in the Southern District of New York and elsewhere, the defendant and others, known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

It further provides it was a part and object of the conspiracy that the defendant and others, known and unknown, would and did transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument of funds to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, to wit, smuggling goods from the United States, in violation of Title 18, United States Code, Section 554, as charged in Count Two of the Information. This is in violation of 18 U.S.C. Section 1956(h).

Count Two alleges:

From at least in or about May 2022 up to and

including in or about September 2023, in the Southern District of New York and elsewhere, the defendant and others, known and unknown, fraudulently and knowingly exploited and sent from the United States, attempted to export and send from the United States and caused to be exported and sent from the United States merchandise, articles and objects contrary to laws and regulations of the United States, to wit, the defendant unlawfully caused companies in the United States to export OLED micro-displays subject to the EAR, Title 15, Code of Federal Regulations, Parts 730 through 744, from the United States to Russia, contrary to Title 50, United States Code, Section 4819(a)(2)(F). This is in violation of 18 U.S.C. Sections 554 and 2.

Does the government have any comments or motions for the Court's consideration before the Court imposes a sentence upon the defendant?

MS. ONG: Yes, your Honor.

The government would respectfully submit that a sentence within the guideline range of 57 to 71 months is necessary to vindicate the Section 3553(a) factors; and in particular, the need for deterrence.

At the outset, we want to highlight three background facts that underscore the seriousness of Marchenko's conduct. First, Russia's invasion of Ukraine in February of 2022; second, Russia's reliance on micro-electronics from the U.S.

through clandestine procurement networks; and, third, U.S. licensing requirements meant to deprive Russia of the resources it needs to sustain its military aggression.

Against this backdrop, Marchenko worked with a procurement network to evade national security controls and lie to U.S. companies and ultimately the U.S. Government about the true destination of the micro-displays, Russia.

The Sentencing Commission and Application Note 1 to Section 2M5.1 contemplates an upward departure under such circumstances. That is, the conduct occurred during a time of war. We want to make clear that we're not asking for an upward departure here; however, we think that this sheds light on how serious Congress and the Sentencing Commission took these matters.

Importantly, Marchenko was a key player in this network. He actually procured the controlled parts using front companies that he admittedly owned and operated. He transferred more than one million U.S. dollars into the United States to smuggle the displays out of the United States, and he reaped the benefits of illegally exporting the sensitive technology. And ultimately Marchenko was prepared to take additional steps to hide the fact that this technology was destined for Russia; for example, by lying to avoid reporting requirements, using lasers to remove serial numbers, opening front companies and bank accounts in other countries and using

different end users.

To be clear, we understand the defendant's position that the parts were controlled only for military end users, but everything described in our sentencing submission and here today, none of that would have been necessary if there was a legitimate purpose for these shipments. And there is powerful circumstantial evidence that these parts were going to military end users, including the fact that the Department of Defense recovered a display, one of these micro-displays, in a rifle scope in Ukraine which had been purchased by the Procurement Department prior to Russia's invasion and the network's direct ties to companies which had been designated as fronts for the Russian Military.

Notably, this conduct would have continued unabated without law enforcement intervention, and had these orders not been interdicted, Russia would have been armed with thousands of military-grade technology that had the potential to cause widespread harm to U.S. national security interests.

The need for the Section 3553(a) factors like deterrence, promoting respect for the law and the need to protect the public cannot be understated. Russia relies on the procurement networks for technology to fuel its military, and despite U.S. export controls, these supplies have continued to flow into Russia. Cutting off Russia's access to such components is necessary to protect U.S. national security

interests and stem the flow of these parts to Russia for use in its weapons.

General deterrence is also a big factor here. Unfortunately, there are many others out there that supply Russia with the military-grade components that it seeks. And it's a lucrative business, especially in light of the export controls that have made these goods even more valuable. A lengthy sentence is needed to deter others. Unlike many of the other cases before your Honor, the deterrent effect here is tangible because there are so many eyes on this case. It is incredibly rare and a testament to the work that law enforcement did to have a key cog in an overseas procurement network sitting in a U.S. courtroom and held to account under U.S. law. A quick Google search shows how widely followed this case is, including in countries like Russia, and underscores the need to send the message that this conduct will not be tolerated and that the Court should impose a sentence that was intended by Congress and the Sentencing Commission, one within the guidelines.

Respectfully, an unduly lenient sentence like the one that's requested by the defendant is not a message that this Court should send to the public, especially at a time when Russia is relying on U.S. source components to continue its aggression in Ukraine.

For these reasons and the reasons in our sentencing

submission, we agree with Probation and respectfully submit that a sentence within the guideline range of 57 to 71 months is appropriate and would serve the legitimate purposes of sentencing.

THE COURT: I have two questions for you.

One is there's an agreed-upon forfeiture amount, but I do not have an order.

MS. ONG: That's correct, your Honor. The funds described in the plea agreement were administratively forfeited and the defendant has agreed not to file a claim for those funds at issue and so there's no need for an order at this time.

THE COURT: So do I have to order forfeiture in this case?

MS. ONG: No, your Honor.

THE COURT: Okay. That's number one.

Number two. My understanding of the average sentence of similarly situated individuals is 42 months. The median sentence is 46 months. So what is it that warrants a guidelines sentence of 57 months, which would be the bottom of the sentencing guidelines? Is it the mere fact that -- is it the situation that we're under in which these purchases or these attempted purchases were made?

MS. ONG: Yes, your Honor. I think the facts underlying our request for a guidelines sentence here are some

of the background facts that I started today with. The fact that Russia is at war with Ukraine. The fact that these procurement networks are designed to get U.S. components out of the United States and other Western countries in order to go to Russia. And in fact, the Department of Defense found one of the micro-displays that were purchased by Radiofid, one of the front companies that was used by the procurement network, in a rifle scope in Ukraine.

THE COURT: All right. Thank you, counselor.

Mr. Lawrence.

MR. LAWRENCE: Yes. Good morning, your Honor.

THE COURT: Any comments you would like to make on behalf of your client?

Let me ask you this question. Because you're asking for a sentence outside of the sentencing guidelines. And you mentioned several cases as being similarly situated defendants, but it kind of seems inconsistent with what the Sentencing Commission has provided to the Court, which is that the average sentence is 42 months for similarly situated individuals and the median sentence is 46 months. So how do you account for that?

MR. LAWRENCE: Your Honor, as I was going to tell you, with the Court's permission, Mr. Allee was going to address the question of the other cases and the sentencing guidelines, so I'm going to defer -- if your Honor wants to

start with that, I'll defer to Mr. Allee with that.

THE COURT: All right. I asked the question. I guess I want it answered first. So Mr. Allee can address the Court first.

MR. ALLEE: Thank you, your Honor, and good morning. It's nice to see you.

THE COURT: Good morning. Likewise.

MR. ALLEE: So I'm in the unfortunate position of answering that question by hopefully explaining why that aspect of the presentence report is not a helpful context or detail for today's sentencing.

THE COURT: Let me just say this, that many courts find -- this is new. It's only been implemented rather recently. Right? But a lot of courts rely on that, on that new section of the presentence report, especially in light of one of the objectives of sentencing is to have some type of -- to do away with disparity in sentencing. So that information is quite helpful in that regard.

MR. ALLEE: Absolutely, your Honor. One of the factors we are prepared to address and we think is extremely weighty in your analysis in imposing sentence, your Honor, is the need to avoid unwarranted sentencing disparities under Section 3553(a) and, here, a guidelines sentence and even a sentence in the neighborhood of the median that your Honor referred to would actually create an unwarranted sentencing

disparity. And I can explain entirely why I'm advocating that to you.

But starting directly with your question, page 21 of the presentence report, that aspect of a PSR and the new PSRs, that can be extremely helpful in many cases I'm sure to the Court and certainly to the parties. In this case, it's not very helpful or not very -- it doesn't provide a great deal of context for this factor, unwarranted sentencing disparities, and the reason is what's aggregated into that information is all of the cases in which Sentencing Guideline 2S1.1 applied. The PSR describes that there were 146 defendants for whom that was the primary guideline in the time period that they looked at. That's the money laundering guideline.

And so what we have to understand in thinking about that data is what are those types of cases. Are they similarly situated? We don't know who they are. We don't have the list of the 146. But are they likely to be or what inferences can we make about how they might relate by analogy to Maxim, who sits here today. And unfortunately, we can't make any of those inferences because a money laundering case can and typically does involve all kinds of other federal criminal conduct. A defendant can be convicted of bank robbery and money laundering and then you go to the money laundering guideline and then maybe there's a cross-reference. A defendant could be convicted of a white-collar fraud and money laundering. A

defendant could be convicted of smuggling and money laundering, which is the case here today and which I'm prepared to address. And so we don't know for any of those 146 cases what the other offense conduct was, whether there was a cross-reference, what enhancements applied or did not apply.

So its in and of itself perhaps a data point we have that there is a median sentence in the area of 42 months -- the average I guess is 42 months, the median being 46 -- but the range of conduct that's scooped into that data point is so broad that it's very hard to say that those defendants are similarly situated to Maxim and, therefore, that a sentence imposed on him like that would not create an unwarranted sentencing disparity.

Thankfully, your Honor, there are cases and both parties have attempted to cite to your Honor cases in our briefing, which I would like to address further if your Honor will permit, which are very useful data points. The cases we cite involve similarly situated defendants. We think the cases the government cited involve defendants who are not similarly situated. And those are very useful data points in thinking through this sentencing factor, which is the need to avoid unwarranted disparities.

In our brief, we cited three cases. And your Honor, just to be clear, we understand sometimes it's hard to look at cases in other districts and it's just something that a court

might not want to consider because you have a wealth of information in your sentencings here and just closer to home, but we should all understand this is not a typical case. Cases like this, with these guidelines, with these circumstances, don't come through this courthouse all the time, and so that's why we looked further to other districts for similarly situated defendants.

One case which we cited in our brief and which the government attempted to distinguish in their brief is United States v. Nevidomy, N-E-V-I-D-O-M-Y. It's a case out of the Southern District of Florida, your Honor. The defendant was sentenced to 26 months imprisonment, at least initially. The sentence was later reduced. The facts of that case, according to the sentencing materials submitted to the Court, will sound strikingly similar to this case, including the arguments made by the government. If you look at the sentencing submission of the government in that case, the government attempted to respond to the defendant as follows. They argued the defendant claims a substantial variance is warranted. The guidelines were 51 to 63 months, your Honor.

And your Honor, I should say up front I don't mean to belabor this point, but I just think it's critical to have these data points of these other cases because it's such a unique circumstance that Maxim is before your Honor on.

The defendant argued that the offense posed no threat

to the security of foreign policies in the United States and the guidelines greatly overstated the offense. The government responded that this had no merit and then argued as follows. The defendant, Nevidomy, willfully disregarded clear signals that his conduct was illegal and that he was breaking the law and actively lied to U.S. suppliers who asked for written assurances through an end-user agreement that he would not be exporting the items.

The items, your Honor, were military-grade night vision and thermal-vision devices and ammunition primers for which the end users were in Russia, your Honor. The payment for these night-vision rifle scopes, the government argued, each of which exceeded $10,000, came from different bank accounts in other places in the world; Latvia, China and Russia. The defendant's clients, Nevidomy's clients, included a Russian individual and others unknown to the defendant.

The materials, the night-vision rifle scopes and the ammunition primers, were listed on the United States munitions list, which is not the case here, and the government argued for good reason these very type of items "have ended up in battlefields around the world and used against U.S. troops." The government then cited to a news report that the Taliban had been using night-vision scopes. And the government argued that there's a risk that military-grade technology like that at issue there will land in the wrong hands, and it was compounded

because the defendant's exports were to places like Russia, a country with a long history of supplying battlefield technology to adversaries. The Court heard that and the defendant was sentenced to 26 months, which is less than -- which is about half of the bottom of the guidelines.

The government, in responding to our brief, purported to distinguish that case on the ground that the defendant received a 5K letter for cooperation, but I took a look back at the case and the government is not being straight about that, or at least not fulsome, because the government clearly advocated for a guidelines sentence. They made one note in their brief that, while "the defendant cooperated in a passport fraud case," because there was a separate passport fraud, "the defendant should receive a reduction for that based on the 5K motion. He should receive no further reduction given the facts and circumstances of the case." And the government also argued that Nevidomy's case, which I just laid out, I summarized the government's arguments, was similar to cases in which defendants received sentences of 51 months or more.

So the government clearly took a position a lot like what you're hearing in this case. The Court heard that, very similar circumstances, and imposed a sentence of 26 months.

And just a footnote on the cooperation point. That defendant later cooperated, after the sentencing, further in the sanctions case, and got a sentencing reduction to time

served. So whatever credit the government argues was implicit in that sentence was not there. It was later. The sentence was later reduced to 14 months. So that's not correct, the government's response. That case is pretty much on all fours.

The two other cases we cited are Ustinov, U-S-T-I-N-O-V, which will also sound strikingly similar at least in terms of the government's arguments, and Kvinikadze, K-V-I-N-I-K-A-D-Z-E. Forgive my pronunciations, your Honor. But again, I belabor these cases and these comparisons because they are much more useful data points for precisely the factor that your Honor is focused on than the aggregation of the 146 money laundering cases which may have involved arson or bank fraud or who knows what else those cases involved.

In Ustinov, your Honor, a case out of the District of Delaware, that sentence was 18 months, which was time served, and the defendant then was deported following the sentence. The crime was a three-year scheme to export military-grade night-vision devices and thermal-imaging scopes to Russia. We cited that case in our brief. The government here purports to distinguish it by saying, well, that was not a smuggling and money laundering case because the violations were for different statutes. That is, again, not the government at least being straight or at least fulsome because the conduct in that case was very, very similar and the statutes -- at least comparing the smuggling, the statutory violations were worse. Those

munitions, the night-vision devices in that case, because they were on the munitions list, the smuggling of them by exportation was so dangerous that it violated other statutes, the International Traffic and Arms Regulation, known as ITAR, and the Arms Export Control Act, AECA. So there were other sort of more applicable statutes than the smuggling statute here. The sentencing guideline range in that case was 46 to 57 months. Again, that defendant was sentenced to 18 months, which was time served.

The government argued in that case that the defendant's conduct implicated serious national security considerations of the United States. Those statutes that I just cited prohibit export of high-tech military hardware outside the United States because this technology is deemed critical to the national security and foreign policy interests of our country by the President. The instant case involves the purchase of that equipment. And then the government argued, once these items were exported to Russia, the military technology could have been used anywhere in the world for a variety of purposes. The government further pointed out that those munitions were defense articles on the munitions list.

In addition, the government emphasized a money laundering aspect of the case which was just not charged, but was, nevertheless, present. The defendant engaged in wire transfers designed to conceal his involvement in the scheme

conducted under the name of third-party companies and originated in offshore accounts in Cypress. The government cited a communication from the defendant that said "I am sending money and I don't get highlighted, nobody knows what I have, what I sent and what we are doing." And the government further argued that the defendant's wire transfers demonstrated a level of sophistication by the defendant to protect his identity from law enforcement. That sounds a lot like this case except that the equipment was strict military-grade whereas, here, the equipment has a civilian use, it's on the EAR, which I'll come to in a moment. That defendant was sentenced to 18 months in that case, time served, and then deported.

To avoid unwarranted sentencing disparities, for the Court to put weight on that factor would suggest that the Court should impose a sentence in the range of these other cases.

The third case we cited in our brief, which I won't belabor, it's such extent, your Honor, is Kvinikadze. It's out of the District of Wyoming. Military-grade thermal-imaging scopes, Russian national, five months, and thereafter left the United States.

The government, in their brief, argues that those cases are distinguishable and I submit, your Honor, the government's wrong, but they then cite two cases that they suggest your Honor should find more akin to the circumstances

here and, again, they're wrong. Those cases are nothing like this case.

The government cites United States v. Unsalan, U-N-S-A-L-A-N, out of the Middle District of Florida and suggest that that's a similar circumstance. Very, very different circumstance. In that case, there was a sanctioned Russian oligarch on a list of sanctioned Russian billionaire oligarchs. The defendant, in clear violation of the sanction, provided that oligarch $157 million, your Honor. The guidelines there were 87 to 108 months. And the government argued that the profiting there was specifically at the expense of Ukrainians because the oligarch had been adverse to Ukrainians for reasons I won't get into because it will take a while.

The government also cites United States v. Wang out of the District of Pennsylvania, a case in which the defendant was sentenced -- multi-defendants, but some were sentenced to 45 months. That case is nothing like this case. First of all, that defendant with the 45 months went to trial, had criminal history, had previously been in the United States and left. The case involved sanctions regarding Iran and transactions involving oil. So it's an Iran sanctions oil case for a trial defendant with a criminal history and a record of international -- he wasn't deported, but had voluntarily left during deportation proceedings. There was no acceptance of

responsibility. And the guidelines -- the post-trial guidelines range of 63 to 78 months resulted, nevertheless, in a sentence of 45 months.

That was probably a longer answer than you bargained for, your Honor, but my point is if you look at all of the money laundering cases, that is helpful, but only to a limited extent here because money laundering is typically tethered to another crime.

THE COURT: The government would say that you're cherry-picking, number one. And number two, I would venture to say that all the cases that you cite to, that you rely on, the three cases primarily that you recite to and rely on, they predate the Russian invasion of Ukraine so that we have to take a much stricter look at this crime and send a stronger message. How do you respond to that?

MR. ALLEE: Your Honor, you've permitted both myself and Mr. Lawrence to talk, and in terms of sending a message in deterrence, I know he's prepared to address that.

THE COURT: I think you also have to address the issue that the cases that you cite to predate Russia's invasion of Ukraine.

MR. ALLEE: Yes, your Honor.

THE COURT: So that we're now at a very different situation such that these actions have much more severe implications.

MR. ALLEE: Yes, your Honor. Let me say a couple things about that.

First I just want to point out that the government's citation to an enhancement that was not in the plea agreement is a stunning thing to hear at a sentencing.

THE COURT: Well, I'm not looking at -- I'm not addressing that. I'm not saying that I'm applying the enhancement. I'm looking strictly at the sentencing guidelines that you've agreed to that apply. Right? I've mentioned that there's an average. There's an average sentence that the courts have applied and there's a median.

Now, you cite to three cases and you say I should take a look at these cases and rely on those three cases when imposing a sentence, that these are true indicators of comparable defendants. But it's fair to say that all three of those defendants committed those crimes at a time that predates Russian aggression on Ukraine. So that if I look at it from the time frame that we're in now, your client's actions have far more far-reaching implications. They're much more severe. His actions, his conduct, is much more severe than those other three defendants that you are relying on.

MR. ALLEE: Yes, your Honor. And I do want to address that. I just want to point out Mr. Lawrence will have other aspects on deterrence, but I want to address directly what you're saying because it's critical in this case to

understand the government's point and why the circumstances here are mitigating.

THE COURT: Forget the government. I'm asking the question from my perspective. All right? From my perspective. When did he commit the crime. Right? And the state of affairs that currently exist. Right?

MR. ALLEE: Yes, your Honor.

THE COURT: It's pretty obvious that the United States is not in partnership with Russia. They're not on the same side with Russia on what's happening in Ukraine. But your client committed this crime, committed these offenses, at a time when Russia is an aggressor, where Russia has invaded Ukraine, and that's the political situation that we're in right now. Right? And so your client's conduct has far, far more implications, right, than those of the other three individuals that you're asking me to rely on.

MR. ALLEE: Yes, your Honor. I want to address directly your question.

So, firstly, we believe there is no dispute, or if there is, we want to make clear our position that our client -- there is no evidence that our client placed any items in any battlefield or was anywhere near the end use of whatever this equipment is or even knows what that was. The case is, rather, against an undisputed middleman who was aware that OLED micro-displays, which I'll discuss in a moment how those are

regulated, were being exported from the United States to Russia, but by deceiving the exporter to think that they were not going to Russia. That's the case.

THE COURT: Towards what end?

MR. ALLEE: The defendant here is a businessman in Hong Kong. He has no interest in their end use. He is convicted and stands rightly before your Honor and is certainly remorseful for his role in this scheme, but there's no allegation that he had anything to do with Ukraine or its battlefield. He is a middleman, your Honor. The deception here was to the U.S. exporter about where these were going.

And to come back to the government's arguments today which they've never said before, that one of these was found on a battlefield, that just came out for the first time during oral argument at sentencing, but let's just be clear about the crime they charged and what was legal and not legal and how the other cases feature arguments very similar notwithstanding they predated the Ukrainian invasion and what we are doing today.

There is not a law and the government does not cite a law that says OLED micro-displays cannot be shipped to -- exported to Russia. There is no such law. OLED micro-displays were not on the munitions list like those other cases. They're on what's called the EAR, the Export Administration Regulations. They're on what's called the EAR 99, your Honor, which, according to the Department of Commerce, is for

products, services and technologies that fall under U.S. Department of Commerce jurisdiction and are not listed on the Commerce Control list. EAR 99 items generally consist of low-technology consumer goods and do not require a license in most situations. However, in some situations, they do require a license, if they're going to certain companies on an entity list.

Here, the crime is over a one-year period from spring of '22 until the summer of 2023 and it began when the U.S. exporter decided, because of the invasion of Ukraine, that it did not want to do business with Russia, have its goods sent to Russia, and that then prompted the deceptions through what the government calls a procurement network to continue the transactions that had happened for years lawfully, but by deceiving the end use. And that's why we're here. And it is painful to Maxim Marchenko and he is certainly remorseful about his participation in it. He was lured out of Hong Kong, he was arrested in Fiji, and he has been here in custody ever since, away from his family, which Mr. Lawrence will address.

There is no law imposed by the United States that these items cannot be exported to Russia. What the law says is that they must be done using the EEI form disclosing their end use and if the end use is sanctioned or on an entity list, there must be a list. And that's where the deception is. And so this case is very much -- notwithstanding that it is during

the time period of the Ukrainian invasion, this case is very much like the cases we cited in which the government argued, based on speculation or on matters outside of the record, that very dangerous materials could end up in dangerous parts of the world from the defendant's conduct, and the courts were able to put that in some context and impose sentences that were far below the guidelines for middlemen or for folks who engaged in deception at the front end of the transaction. That's why those cases are very similar.

And you can read the sentencing submissions on those other cases, your Honor. I have. There were all kinds of references to Russia being an antagonist around the world before the Ukraine invasion just as well as we're hearing now, after the Ukrainian invasion.

The last aspect, your Honor, I want to say about the question about the money laundering, page 21 of the presentence report, is that the money-laundering crime here is not what perhaps we all normally think of like concealment, using crime proceeds and engaging in transactions to conceal the crime or to promote further crime. It's the other provision of the money-laundering statute, which just applies to international transactions. So, here, it's the same conduct that gives rise to the smuggling count that also gives rise to the money-laundering count and that results in four levels on the guidelines that, even though the conduct was the same in those

other cases, were not applied in those other cases. We addressed that in our brief, so I won't go further on that, your Honor, unless you would like me to, but the point is there are four levels in the guidelines in this case. They apply. Legally, they apply, but our point is they push the guidelines into a range that make them unhelpful, not a weighty factor in today's analysis.

THE COURT: I understand. I understand your point. I'll hear from Mr. Lawrence now.

MR. LAWRENCE: Thank you, your Honor.

I think Mr. Allee and I found it rather startling that, having read our sentencing memorandum and the presentence report, the government's sentencing submission seems to completely disregard Mr. Marchenko's personal history and background. While we don't doubt that the factors that Mr. Allee just discussed with you are important in determining a sentence, the Court has to give full consideration to these other specified sentencing factors.

As your Honor knows, Mr. Marchenko was raised in very modest circumstances in a terrible neighborhood in Moscow. He grew up surrounded by violence both in his community and his school. You're aware of the difficult circumstances he endured both as a child and trying to embark on a career in business. And I know you appreciate the difficulties that even being a citizen of Russia during these years that Mr. Marchenko grew up

in wasn't the easiest existence. Despite these obstacles, Mr. Marchenko was able to develop a successful business which, other than the instances that led to his being charged here, was a business that, for a long period of time, was entirely lawful.

And Mr. Marchenko started a wonderful family. I know your Honor gets lots of letters in support of defendants who are being sentenced. Mr. Allee and I found the letters that were written on behalf of Mr. Marchenko to be particularly impactful and unusual, letters from more than 40 family members, friends and colleagues. And what resonates from all of these letters is a description of an individual who is warm and hospitable and generous and caring and has personal characteristics that are admirable. And the letters describe someone who you would not expect is typical of people in his culture and who grew up under his circumstances.

Mr. Marchenko's kindness and generosity are described powerfully by people in both his professional circles and by family and friends. The letters written by Mr. Marchenko's wife and one of his sons are moving. His family shared with your Honor what a great husband and father he is, how aberrant what he has been convicted of as to who he is at his core and how devastating his detention has been here in the United States.

One thing which was not mentioned by either the

government or Mr. Allee that I think is worth noting and is a factor your Honor can take into account is that, while Mr. Marchenko is not the recipient of a 5K letter, Mr. Marchenko did in fact cooperate with the government immediately upon his arrest. He proceeded to meet with the arresting agents and made consensual recordings and made a full statement, and that information presumably was helpful to the government.

The government acknowledges --

THE COURT: I'm going to interrupt you.

Is that the case?

MS. ONG: That's correct, your Honor. No additional charges were brought against anybody else, but Mr. Lawrence's recitation of the facts that Mr. Marchenko gave us a statement and made two recorded calls is correct.

THE COURT: So he was attempting to cooperate?

MS. ONG: Your Honor, I don't know if we could characterize it as cooperating in the sense that our office usually has cooperators. I would say he made two controlled calls and that was the extent of it. He didn't further meet with the government beyond a postarrest statement or those controlled calls.

THE COURT: Take a step back.

When you say he made two controlled calls, what do you mean by that?

MS. ONG: He made two calls to two individuals.

THE COURT: Who were part of the scheme?

MS. ONG: Yes, your Honor.

THE COURT: For what purpose? And why was it being recorded? Was it for purposes of ultimately attempting to get admissions of some sort --

MS. ONG: Yes, your Honor.

THE COURT: -- or to get further information so that the investigation could go on to another level?

MS. ONG: I think your Honor's correct on both circumstances.

THE COURT: Sounds to me like he was trying to cooperate even though there was no actual agreement made.

MS. ONG: Your Honor, he did refuse to continue to meet with the government after that.

THE COURT: Thank you.

MR. LAWRENCE: Your Honor, I think that the refusal to meet with the government was that the information -- the two unindicted co-conspirators that were part of this network who, in our view, were more culpable than Mr. Marchenko, that there was no interest from the government in any more information that he would offer regarding these other individuals. But it is our view that, at the time of his arrest, he assisted the government and did what they wanted him to do, and I think that is something your Honor can consider.

THE COURT: Okay.

MR. LAWRENCE: Your Honor, the government acknowledges that Mr. Marchenko has no prior criminal history, yet they suggest somehow in their sentencing memorandum that it's possible he may have had prior convictions in either Russia or Hong Kong. And your Honor, frankly, I think that's grossly unfair to suggest that with zero good-faith basis to do so. Mr. Marchenko has never violated --

THE COURT: I mean, that would be pure speculation if I were to consider that.

MR. LAWRENCE: Pure speculation, but it was suggested by the government as somehow something your Honor should consider in imposing sentence.

The government, in its sentencing submission and in its remarks today, has tried to portray Mr. Marchenko as a dishonest businessman, and while the specific sales that are the subject of this prosecution were prohibited, for most of his life, Mr. Marchenko earned money engaged in business activity that was entirely legal and proper and almost entirely did not involve any United States companies or interests.

If one of your Honor's goals in sentencing Mr. Marchenko is to impose sufficient punishment and also to impose a sentence that creates general deterrence to others to not commit these offenses, he has been more than adequately punished to achieve both of these goals.

Mr. Marchenko was arrested in Fiji last year when traveling with his family, detained and brought to the United States to be prosecuted and has been in custody imprisoned for almost a year. His incarceration to date has included the loss of all income to support his family, and his separation from his wife and children has been devastating. In addition to the substantial loss of income --

THE COURT: I'm going to interrupt you for a second.

I don't understand why defense counsel always give that example because it's the defendant's own conduct that created the situation. If he had been a law-abiding citizen, if he had not strayed from the law, he would have had his job and he would not have been separated from his family. Right? It's of his own doing. And he admitted that.

MR. LAWRENCE: Understood, your Honor.

THE COURT: And so how is that a punishment that I should consider as having been imposed?

MR. LAWRENCE: It was actually more focused on general deterrence, so that someone who has learned about the consequences of being prosecuted for this will realize that, yes, as a result of their own conduct, they would lose the ability to help support their family. I'm not suggesting that this self-incurred harm that he created with his family is something that should be deemed as part of the punishment in this case.

THE COURT: Okay.

MR. LAWRENCE: What I do think is a financial consequence that your Honor can consider in what is a sufficient, but not greater than necessary sentence is the $1 million forfeiture that he has agreed to and is not contesting. That is clearly something that is part of the punishment in this case.

THE COURT: But that forfeiture is a result of what? Those were proceeds that were what?

MR. LAWRENCE: That were earned as part of his illegal conduct in this case.

THE COURT: So it's illegal gains.

MR. LAWRENCE: Yes.

THE COURT: That's not punishment. That's not punishment to me. You're not punished by using illegal gains, which is what you're suggesting.

MR. LAWRENCE: But --

THE COURT: You earn an honest wage, you're entitled to it, but if it's obtained illegally, it's nothing earned.

MR. LAWRENCE: Understood, but in terms of someone who is looking at what the consequences are, I think it's also something that can be considered in terms of general deterrence.

Regarding specific deterrence, the government claims that Mr. Marchenko, without a guidelines sentence, will somehow

be tempted to participate in similar conduct again. Once again, your Honor, that is rank conjecture and common sense compels the conclusion that it's inconceivable after what he's gone through that he's going to engage in similar conduct in the future.

One thing that the government mentioned in its sentencing submission that is a bit of a head scratcher is somehow your Honor should impose a guidelines sentence because the government had to expend resources to prosecute Mr. Marchenko and that somehow the effort and the expenditures to prosecute Mr. Marchenko warrants a guidelines sentence. Most respectfully, your Honor, the amount of effort to prosecute Mr. Marchenko does not correlate to the amount of time he should spend in prison. Expenditure of time and effort and funds is not a factor under 3553(a).

THE COURT: I agree with you.

MR. LAWRENCE: Your Honor, the other thing the government mentioned is that somehow, as far as general deterrence, this case has had a lot of publicity and that people are watching the case. Well, it's not Mr. Marchenko that created the publicity. The government issued a press release and had they not issued any press release, there would be no public interest in the case to be aware of.

Your Honor, Judge Román, Mr. Marchenko is a really good man. Did he violate the law? Yes. Is it in stark

contrast to everything else you know about him? Yes. Is he likely to offend again? No. And has the punishment suffered already been punishment enough? We most respectfully suggest yes.

Mr. Marchenko has no intention of fighting extradition upon the conclusion of serving his sentence, and it's our view that it's time for him to go back home to Russia, reconnect with and repair his relationship with his family and continue to engage in lawful business activities to be able to support them.

THE COURT: May I ask this question, and that is so it's your position, based on what you've presented, your arguments that you presented, that a sentence of between 5 and 26 months is warranted? Given the three cases that you cited to me, that a sentence in the range from 5 to 26 would be appropriate?

MR. LAWRENCE: I think that that range --

THE COURT: Those are the examples that you gave me. You gave me a 5-month case on the low end and then you gave me a 26-month case on the high end. So it would be fair for me to infer from that that a sentence between 26 and 5 months would be appropriate because it would be akin to those other defendants that were similarly situated?

MR. LAWRENCE: Yes, your Honor.

THE COURT: Assuming I find that that's the case.

MR. LAWRENCE: Yes, your Honor; although, obviously, we're asking that, within that range, a sentence that effectively --

THE COURT: You're asking for the low range. I get that. I get that. You wouldn't be sitting before me if you didn't ask for that, so I get that.

I do want the government, though, to address the arguments made by Mr. Allee regarding the three cases and what, if any, distinction there is.

MS. ONG: Certainly, your Honor.

I think your Honor's absolutely right that there are changed circumstances here; namely, that Russia --

THE COURT: Why should I consider the political -- what's happening out there?

MS. ONG: I mean, that is one of the reasons why we pointed to the application note in the sentencing guidelines. That was something that the Sentencing Commission and Congress had indicated was a factor that your Honor can and should consider under 3553(a).

THE COURT: Well, let me ask you this. I mean, there's always tension between Russia and the United States.

MS. ONG: Yes, your Honor, but now --

THE COURT: They don't appreciate our conduct or our movement into certain regions. We don't appreciate their movement into certain regions.

MS. ONG: That's correct, your Honor, but in this instance, they are at war with Ukraine, they did invade Ukraine, which led to the changes that we've talked about today, the changes that we listed in our sentencing submission.

And I think here, also, the defendant is a sophisticated actor who had multiple front companies in different jurisdictions. He had multiple offshore bank accounts that he was using.

THE COURT: These chips are not necessarily used for military purposes. They have other uses, as well, right?

MS. ONG: That's correct, your Honor. These are dual-use OLED micro-displays. But, here, we cited, first, the fact that a rifle scope had been found, which we put in our sentencing submission on page 11, so this isn't the first time that we've brought it up. There's also a number of text messages that we cited for your Honor that we included in the complaint that show that the defendant knew what he was doing. If I can just read one of them.

December 16th, 2022 he sent a link to an article to one of his co-conspirators who we've called CC2. That article was about the supply chain that keeps tech flowing to Russia. And that whole article was about the U.S. export restrictions against Russia and how, despite those restrictions, the global supply chain continued to feed Russia with Western technology.

There was another text message that we cited that

happened earlier, that was December 2021, a serious of text messages in which the defendant received a text from a vice president of a foreign bank and it says, "Dear Maxim, since the word electronic components was an entity hit the sanctions, going forward, please avoid using it. You can use the short form Electcomp instead." Two days later, Marchenko then told CC1. This is company 1, who we've identified in the complaint as company 1. And then there was a final text message that we cited, your Honor, that Mr. Marchenko sent to CC2 on June 29th, 2022 which had to do with certain Chinese companies being blacklisted for violating sanctions by supporting Russian defense. Mr. Marchenko sent the text "the White House blacklisted five Chinese companies for violating sanctions by supporting Russian military and defense companies. This includes," and then it lists the five companies. "Today's actions sent a strong message to businesses and individuals around the world that if they seek to support Russia, United States will take action." And that was a quote from U.S. Deputy Secretary of Commerce Alan Estevez. And CC2 responded --

THE COURT: What's the link that Mr. --

MS. ONG: Mr. Marchenko actually copied -- or pasted that text. So it's a quote from the Deputy Secretary of Commerce. He sent that to CC2. And CC2 responds, "So we'll be more careful."

And there's also the conversations between CC1 and Mr. Marchenko in which they talk about CC1 telling Mr. Marchenko that they support the legend that is Alice Components.

And so we think, your Honor -- and one more point, your Honor. I know that Mr. Lawrence said Mr. Marchenko was vacationing with his family in another country when he was picked up. I will note that he was there with his wife when he met the UC and his wife --

THE COURT: I don't think that's really a factor.

MS. ONG: I'm sorry?

THE COURT: That's not really a factor. That's not relevant --

MS. ONG: Understood, your Honor.

THE COURT: -- that he was apprehended while on vacation.

MS. ONG: Your Honor, we would submit that he was there to meet --

THE COURT: Let me ask you this. How is this case distinguishable from those three cases that Mr. Allee referenced?

MS. ONG: Your Honor, I think it's a number of things that we've touched on, but I'll list them here. It's the fact that Russia was at war. It's the fact that Mr. Marchenko is a sophisticated actor. It's the fact that there was more

tangible harm because of the fact that Russia was at war with Ukraine. And again, the Department of Defense found one of these micro-displays in a rifle scope on the battlefield in Ukraine and so it's not just a hypothetical sort of application of the micro-displays. We know that's where they were actually going.

And we've listed out the lies I think many times both in our sentencing submission and we've touched on it here today, so I am not going to list out every single lie that was told by Mr. Marchenko in the procurement network, but there's no need to have any of those lies if these were going to a legitimate purpose. There was no need for the lasers to take off serial numbers if this was going to a legitimate purpose or for Mr. Marchenko to advise the undercover to lie on forms in order to avoid reporting requirements. None of that would be required if this was going for a legitimate purpose.

THE COURT: All right. Thank you, counselor.

Mr. Lawrence, I'll let you have the last word before I have your client address the Court.

MR. LAWRENCE: I know Mr. Marchenko does want to address the Court, your Honor.

THE COURT: You don't have anything further to say?

MR. LAWRENCE: No.

THE COURT: All right. So I'll hear from your client.

THE DEFENDANT: Good morning, your Honor. Thank you for letting me speak to you today.

I would like to apologize for my actions in this case and tell you that I sincerely regret them.

I have always worked very hard in my professional life to have people trust and respect me and know me as an honest person. I was not honest here. I used poor judgment and I chose not to think of the consequences.

I have been separated from my wife and two sons and caused them great pain and suffering. We are a close family. We do everything together and they mean everything to me. My sons have been hurting badly since they had to move to Moscow. I know that I caused this and it has been very painful for me. I hope your Honor can believe that I made a bad decision, but I am not a bad person and let me return to my family.

Thank you.

THE COURT: All right. Thank you for your remarks.

In accordance with the decision by the Supreme Court in United States v. Booker, while the United States Sentencing Guidelines are not mandatory, this Court nonetheless must consult those guidelines and take them into account when sentencing. Therefore, this Court has considered the findings of facts stated in the presentence report as well as the guidelines analysis and recommendations contained therein. The Court has weighed this information along with the factors

listed in 18 U.S.C. Section 3553(a) in coming to its final sentencing decision.

The Court adopts the factual recitation in the presentence investigation report. The presentence investigation report includes a computation that Mr. Marchenko's criminal history falls into category I and his offense level amounts to 25. The guideline sentence for that offense level and criminal history category is 57 to 71 months imprisonment to be followed by a supervised release term of one to three years for both Counts One and Two.

In addition, the applicable fine range is $20,000 to $200,000.

There is no applicable amount of restitution or forfeiture, although the government has represented to the Court that there is a forfeiture amount to which Mr. Marchenko has decided will not be challenged.

The applicable special assessment is $100 per count for a total of $200.

Mr. Marchenko, you have pled guilty to Counts One and Two of the Information. The Probation Office has recommended that the Court impose a sentence of 57 months for Count One and 57 months for Count Two to run concurrently. The Probation Office noted that for this offense, you must pay a special assessment of $100 per count for a total of $200 in accordance with 18 U.S.C. Section 3013. The Probation Office has

recommended that a fine of $20,000 be imposed. Probation further recommends that you forfeit $1,302,467.35 to the government. My understanding is that that forfeiture has already been addressed and the Court doesn't need to order any further forfeiture.

Subsection (a)(1) of 18 U.S.C. Section 3553 requires that courts take into consideration the nature and circumstances of the offense and the history and characteristics of the defendant. Subsection (a)(2) of 18 U.S.C. Section 3553 requires that the Court consider the need for the sentence to promote certain objectives of the criminal justice system; namely, punishment, specific and general deterrence and rehabilitation. The Court must also consider the kinds of sentences available, the sentencing guidelines, pertinent policy statements, the need to avoid unwarranted sentencing disparities and the need to provide restitution to victims.

I have considered the arguments made by both sides and the information provided by the parties, including Mr. Marchenko's acceptance of responsibility for his actions, the nature and circumstances of the crime, his prior criminal history, his history and characteristics and the seriousness of his crime.

Taking into account the nature and circumstances of the offense and the history and characteristics of the

defendant and considering all of the factors listed in 18 U.S.C. 3553(a), this Court finds that a sentence of 36 months imprisonment for both Counts One and Two to run concurrently to be followed by a term of three years of supervised release on both Counts One and Two to run concurrently is reasonable and appropriate and that such terms are sufficient, but not greater than necessary to promote the proper objectives of sentencing.

Further, the defendant is ordered to pay to the United States a mandatory special assessment of $100 for each count, which is $200, which shall be due immediately.

Finally, despite the presentence report's recommendation, I will not impose a fine, as suggested, and given the government's representation with respect to the forfeiture of funds by Mr. Marchenko, the Court will not order any forfeiture in this case.

Mr. Marchenko, upon your release from custody, you shall be placed on supervised release for a period of three years. During your term of supervised release, you must comply with the mandatory conditions of supervision listed on page 28 of the presentence report, the standard conditions of supervision listed on pages 28 and 29 of the presentence report, and the special conditions of supervision listed on page 29 of the presentence report.

With respect to the special conditions, the Court notes that the presentence report references Mr. Marchenko's

immigration status, which warrants the imposition of the special condition which requires him to obey the immigration laws and comply with the directives of the immigration authorities.

And given the nature of the crimes involving the unlawful purchase and export of micro-display electronic devices which are the subject of the Export Administration Regulations, the additional special conditions are, likewise, warranted, those special conditions being to provide Probation with access to any requested financial information and to refrain from recurring new credit charges or opening additional lines of credit without the approval of the probation officer unless the defendant is in compliance with any installment payments that are in effect.

Actually, that last special condition does not apply given that there's no payment involved here.

Mr. Marchenko, do you understand these conditions?

THE DEFENDANT: Yes.

THE COURT: All right. The sentence as stated is imposed.

Mr. Marchenko, you do have the right to appeal your sentence. Any notice of appeal must be filed within 14 days after the entry of judgment, so if you wish to appeal, you must advise your attorney to prepare and file a notice of appeal immediately. If you are unable to pay the costs of an appeal,

you have the right to apply for leave to appeal in forma pauperis, meaning as a poor person. If you make such a request, the Clerk of the Court must immediately prepare and file a notice of appeal on your behalf.

Do you understand your right to appeal to the extent it may exist?

THE DEFENDANT: Yes.

THE COURT: Are there any remaining counts or underlying charging instruments that need to be addressed at this time?

MS. ONG: No, your Honor.

THE COURT: All right. Any recommendations with respect to BOP?

MR. LAWRENCE: Yes, your Honor. I know that Mr. Marchenko is not camp eligible, and in consultation with the Bureau of Prisons and to facilitate his deportation, I'm going to ask if your Honor would recommend that he be designated to the low-security correctional institution at Allenwood, Pennsylvania.

THE COURT: All right. Let me give that some thought.

Any other applications?

MR. LAWRENCE: No, your Honor.

MS. ONG: Your Honor, we would just make one clarification. I know that defense counsel noted at the outset

that they made some objections to the factual findings in the PSR. I just wanted to clarify that those did not affect or were considered by you at sentencing.

THE COURT: Okay. There were no changes made to the presentence report other than one or two I think minor changes that were made is my understanding --

MS. ONG: Okay.

THE COURT: -- based on the objections.

MS. ONG: Understood. Thank you, your Honor.

THE COURT: But there were no other changes made to the final presentence report that was presented to the Court.

Anything further?

MR. LAWRENCE: No, your Honor.

THE COURT: All right. There being nothing further, we're in recess.

----